**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::
**ROBERT D. MCLEE,**

                                          **Petitioner,**

                      **-v.-**                                 **9:09-CV-0749**
                                                                **(TJM)**

**MARK BRADT, Superintendent,**

                                          **Respondent.**
::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::
**APPEARANCES:**                              **OF COUNSEL:**

**FOR THE PETITIONER:**

**OFFICE OF J. SCOTT PORTER**                 **J. SCOTT PORTER, ESQ.**
One Park Place, Suite 624
300 South State Street
Syracuse, NY 13202

**FOR THE RESPONDENT:**

**HON. ANDREW M. CUOMO**                      **THOMAS B. LITSKY, ESQ.**
New York State Attorney General              Assistant Attorney General
120 Broadway
New York, NY 10271

**THOMAS J. MCAVOY**
**SENIOR, UNITED STATES DISTRICT JUDGE**

**MEMORANDUM-DECISION AND ORDER**

**I.     BACKGROUND**

      The state court records provided to this Court reflect that on April 30, 2003, Officer

Patrick VanSlyke of the Syracuse Police Department was on patrol in the City of Syracuse, New

York with his partner, Officer John Fay.  *See* Transcript of Trial of Robert D. McLee (12/8/03)

("Trial Tr.") at p. 833.  At approximately 9:20 p.m. that evening, Officer VanSlyke received a

radio dispatch indicating that shots had been fired at the Rolling Green Estates apartment

complex on East Fayette Street in the City of Syracuse. *Id.* at pp. 833-834. Officers VanSlyke and Fay proceeded to that location, where they observed people running from a building from which shots had purportedly been fired. *Id.* at p. 835. As the officers approached the back of a building located in the complex, they discovered a young man, later identified as Alejandro Rodriguez, lying face down on a sidewalk next to the building. *Id.* at pp. 836-37. Rodriguez did not respond to Officer VanSlyke when he called out to him, and the officer thereafter discovered that Rodriguez had no pulse and appeared to have been shot in his back. *Id.* As Officer VanSlyke was requesting an ambulance for Rodriguez, a number of people began shouting at him that more shots had been fired and that there were more victims of gunfire. *Id.* at p. 837. Soon thereafter, two males burst through a door of an apartment in the complex, and the officer discovered that one of those individuals, Jose Padilla, had been shot multiple times. *Id.* at pp. 838-39. In addition to the foregoing victims, it was also determined that as a result of the shooting at the Rolling Green Estates complex on April 30, 2003, Joshua Harper sustained a "grazing" bullet wound to his hand (*id.* at p. 1332); a bullet had traveled through the pant's leg of Arnaldo Sanchez (*id.* at pp. 1238-39) and Cedric Harper sustained a gunshot wound to his right foot. *Id.* at p. 1080.

During the course of their investigation, the police interviewed Michael Wallace and Ernest Shaw, both of whom implicated petitioner, *pro se* Robert D. McLee in the shooting. *Id.* at pp. 1495-1500, 1682-92. After McLee had been identified as a potential suspect, he was taken into custody, and, after having waived his *Miranda* rights,[1] he was questioned by law enforcement agents about the April 30, 2003 shooting. During that questioning, McLee initially

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

claimed that he was home the entire evening of April 30, 2003, with his mother and his sister,

Sabrina Ishmail, except for a brief period of time lasting approximately five minutes.  Trial Tr. at

pp. 1844-45.  Officer Edward MacBlane described the substance of his conversation with McLee

regarding his alibi as follows:

| | |
|---|---|
| The Prosecution: | Okay.  During the course of your conversation with [McLee], did you discuss any further the issue of his alibi? |
| Officer MacBlane: | At times we had taken breaks and I was able to talk to other Detectives who were interviewing Sabrina Ishmail. |
| The Prosecution: | And she being whom? |
| Officer MacBlane: | The sister of Mr. McLee. |
| The Prosecution: | Okay.  And did you learn some information that was being provided by Miss Ishmail? |
| Officer MacBlane: | Yes, I had learned that -- |
| [Defense Counsel]: | Objection. |
| The Court: | Sustained. |
| The Prosecution: | As a result of gaining that information, did you go back and continue to talk to Mr. McLee? |
| Officer MacBlane: | Yes, I did. |
| The Prosecution: | And do you recall what you said to Mr. McLee about that? |
| Officer MacBlane: | I asked him -- |
| [Defense Counsel]: | Objection. |
| The Court: | No.  Overruled. |

3

[Defense Counsel]:    May I approach.

(Discussion held off the record at the Bench).

The Court:    Go back and ask your question again.

The Prosecution:    Detective, can you explain what you said to the defendant?

[Defense Counsel]:    Objection, Judge.

The Court:    What he said to the defendant.

[Defense Counsel]:    May I approach again, Judge.

(Discussion held off the record at the Bench).

The Court:    You may continue, Mr. DeMartino.

The Prosecution:    Can you tell us what you told the defendant regarding the issue of Sabrina Ishmail?

[Defense Counsel]:    Objection.

The Court:    Sustained as to the form of that question. That's the ruling, Mr. DeMartino. You can move on.

The Prosecution:    You had a discussion with Mr. McLee regarding his being allegedly elsewhere that evening, is that correct?

Officer MacBlane:    Correct.

The Prosecution:    And those were words that he told you, correct?

Officer MacBlane:    Correct.

The Prosecution:    Can you tell us did you discuss that issue further with him?

Officer MacBlane:    Yes, I did.

4

| | |
|---|---|
| The Prosecution: | Can you explain what the conversation consisted of? |
| Officer MacBlane: | I asked him is there any reason why his sister ... |
| [Defense Counsel]: | Objection. |
| The Court: | Sustained.  Tell us what he told you.  Never mind what the sister told you.  Tell us what he told you? |
| Officer MacBlane: | He told me his sister is lying. |
| [Defense Counsel]: | Could we approach, Judge? |
| The Court: | No.  You don't need to approach.  He just said his sister is lying. |
| [Defense Counsel]: | What does that mean, though.  My – |
| The Court: | Mr. DeMartino, you can go on. |
| The Prosecution: | Well, Judge, I can't go on because they're hearing half of a conversation? |
| The Court: | That is the Court's ruling. |
| The Prosecution: | Well, can you tell us what he said regarding this conversation that you had regarding Sabrina Ishmail, please? |
| Officer MacBlane: | He says I don't care what she's saying.  I'm telling you I was home all night with the exception of going to the market. |
| The Prosecution: | Anything else? |
| Officer MacBlane: | That's it. |

Trial Tr. at pp. 1636-39.[2]

As the interview with McLee progressed, Officer DeJoseph informed McLee that the police had received "damning" information about McLee from Wallace.  Trial Tr. at p. 1858. McLee then became "a little bit despondent," and stated:  "I guess you made your case.  It looks like I'll just do the time."  *Id.* at p. 1859.  When the officer asked McLee whether he was sorry that a boy died as a result of McLee's actions, he said "of course" and added that Rodriguez "was not the target of [the] shooting."  *Id.* at pp. 1863-64.  McLee then began crying, and volunteered that Sanchez had been the actual "target" of the shooting because he had "broke[n] the rules" in an ongoing conflict involving himself and McLee.  *Id.* at p. 1865.[3]  McLee then informed the officer that McLee wished to handwrite his confession "so that he could be sure to offer his apologies to the victim's family."  Trial Tr. at p. 1867.

As a result of the foregoing, an Onondaga County grand jury returned an indictment against McLee in which it accused him of committing the crimes of murder in the second degree, contrary to New York Penal Law ("Penal Law") § 125.25(1); four counts of attempted murder in the first degree, in violation of Penal Law §§ 110 and 125.27(1)(a)(viii); and second degree criminal possession of a weapon, contrary to Penal Law § 265.02(3).  *See* Indictment Number 03-480-1 ("Indictment").

McLee's jury trial on the foregoing charges commenced on December 8, 2003 in

_____

[2] Officer Christopher DeJoseph similarly testified on direct examination that he questioned McLee about the information that had been learned from Ishmail, and that McLee responded by claiming that his "sister must be lying."  Trial Tr. at p. 1845-46.

[3] McLee then provided Officer DeJoseph with examples of how, in McLee's opinion, Sanchez had "broken the rules."  Trial Tr. at pp. 1865-66.

Onondaga County Court with Onondaga County Court Judge Anthony F. Aloi presiding. At the conclusion of that proceeding, the jury convicted McLee of all charges. Trial Tr. at pp. 2499-2500.

In a decision dated September 29, 2006, the New York State, Supreme Court, Appellate Division, Fourth Department unanimously affirmed the convictions and sentences. *People v. McLee*, 32 A.D.3d 1315 (4th Dep't 2006). McLee's application to New York's Court of Appeals seeking leave to appeal the Appellate Division's decision was denied by the Court of Appeals in its decision dated January 22, 2007. *See People v. McLee*, 8 N.Y.3d 847 (2007).

### B.    This Action

On June 30, 2009, counsel filed a petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on behalf of McLee. *See* Dkt. No. 1 ("Petition"). Attached to that petition is a memorandum of law in support of the habeas request. *See* Attachment to Petition ("Supporting Mem."). In his pleading, McLee asserts only one ground for relief; he claims that during the prosecution's case in chief, the District Attorney improperly elicited hearsay testimony from prosecution witnesses concerning the statement McLee's sister purportedly made to law enforcement agents which contradicted his alibi. *See* Petition, Ground One; *see also* Supporting Mem. at Exh. D. McLee asserts that the admission of the foregoing testimony violated his right under the Sixth Amendment to the United States Constitution to confront his accusers. *Id.*

On December 10, 2009, the Office of the Attorney General of the State of New York, acting on respondent's behalf, filed a response to McLee's petition. Dkt. No. 7. Respondent has also provided the Court with various state court records relating to the criminal matter below (Dkt. No. 8), together with a memorandum of law in opposition to McLee's petition. Dkt. No. 9

("Resp. Mem.").

McLee's counsel thereafter submitted a reply memorandum of law in further support of the petition.  *See* Dkt. No. 11 ("Reply").

This matter is currently before this Court for disposition.

II.     **DISCUSSION**

   A.     **Standard of Review**

The enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA") brought about significant new limitations on the power of a federal court to grant habeas relief to a state prisoner under 28 U.S.C. § 2254.  In discussing this deferential standard, the Second Circuit noted in *Jones v. West*, 555 F.3d 90 (2d Cir. 2009) that:

> a federal court may grant a writ of habeas corpus for a claim that
> has previously been adjudicated on the merits by a state court only
> if the adjudication of the claim:
>
>> (1) resulted in a decision that was contrary to, or
>> involved an unreasonable application of, clearly
>> established Federal law, as determined by the
>> Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an
>> unreasonable determination of the facts in light of
>> the evidence presented in the State court
>> proceeding.

*Id.* at 96 (quoting 28 U.S.C. § 2254(d)); *see also DeBerry v. Portuondo*, 403 F.3d 57, 66 (2d Cir. 2005); *Miranda v. Bennett*, 322 F.3d 171, 177-78 (2d Cir. 2003); *Boyette v. LeFevre*, 246 F.3d 76, 88 (2d Cir. 2001).  In providing guidance concerning application of this standard, the Second Circuit has observed that:

> [A] state court's decision is "contrary to" clearly established federal

> law if it contradicts Supreme Court precedent on the application of
> a legal rule, or addresses a set of facts "materially
> indistinguishable" from a Supreme Court decision but nevertheless
> comes to a different conclusion than the Court did.  [*Williams v.
> Taylor*, 529 U.S. 362,] at 405-06 [(2000)]; *Loliscio v. Goord*, 263
> F.3d 178, 184 (2d Cir. 2001).... [A] state court's decision is an
> "unreasonable application of" clearly established federal law if the
> state court "identifies the correct governing legal principle from
> [the Supreme] Court's decisions but unreasonably applies that
> principle to the facts" of the case before it.  *Williams*, 529 U.S. at
> 413.

*Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007); *see also Williams v. Artuz*, 237 F.3d 147, 152 (2d Cir. 2001) (citing *Francis S. v. Stone*, 221 F.3d 100, 108-09 (2d Cir. 2000)).

Significantly, a federal court engaged in habeas review is not charged with determining whether the state court's determination was merely incorrect or erroneous, but instead whether such determination was "objectively unreasonable." *Williams*, 529 U.S. at 409; *see also Sellan v. Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001).  "While the precise method for distinguishing objectively unreasonable decisions from merely erroneous ones is somewhat unclear, it is well-established in this Circuit that the objectively unreasonable standard of § 2254(d)(1) means that petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief."  *Sorto v. Herbert*, 497 F.3d 163, 169 (2d Cir. 2007) (internal quotation marks and alteration omitted).  That increment, however, "need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Overton v. Newton*, 295 F.3d 270, 277 (2d Cir. 2002) (internal quotation marks omitted).

### B.    Substance of McLee's Claim

In the only ground for relief he asserts in this action, McLee argues that by allowing the jury to hear, through the testimony of Officers MacBlane and DeJoseph, that McLee's sister had

provided information to law enforcement officials which suggested that her brother's alibi was false, the court deprived McLee of his fundamental right to confront witnesses against him because she did not testify at McLee's trial. *See* Petition, Ground One; *see also* Supporting Mem. at Exh. D.

### i.     Clearly Established Supreme Court Precedent

The Confrontation Clause of the United States Constitution provides "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const., Amend. VI; *see Kentucky v. Stincer*, 482 U.S. 730, 736 (1987). "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (internal quotation marks and citation omitted). In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court, in interpreting the Confrontation Clause in the context of hearsay testimony offered at trial, determined that "[t]estimonial statements of witnesses absent from trial" are admissible "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine [the witness]." *Id.*, 541 U.S. at 59. However, the *Crawford* Court noted that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at n.9.

### ii.     Contrary to, or Unreasonable Application of, Clearly Established Supreme Court Precedent

Petitioner argues that the officers' testimony that concerned Sabrina Ishmail's out-of-court statements regarding McLee's whereabouts on the evening of the crimes was testimonial evidence under *Crawford*, and that because such testimony was offered for the truth of the matter

10

asserted therein, the introduction of that evidence deprived petitioner of his Sixth Amendment

right to confront his accuser. *See*, *e.g.*, Supporting Mem. at pp. 16-22.

Respondent argues that:

> the limited testimony concerning what Detectives MacBlane and
> DeJoseph told petitioner regarding petitioner's sister, and what
> petitioner's response was to the detectives, was necessary to
> understand the nature of the police investigation and provide back
> some context to the petitioner's interrogation.

Resp. Mem. at p. 26.

In his Reply, McLee argues that the testimony of the officers was "mere[ly a] conduit[]

for Sabrina's out-of-court statements, [that was] used at trial not for 'context' or 'background,' but

to show that another member of McLee's family was calling his alibi a ruse." Reply at p. 2.

The Court initially finds that the disputed testimony was not offered for the truth of the

matter asserted, but instead provided the context in which McLee's confession was obtained.

Significantly, the record demonstrates that McLee was informed of the fact that his sister had cast

doubt on his alibi during the interrogation at which he ultimately admitted his guilt in the

shootings. *E.g.*, Trial Tr. at pp. 1845-46, 1858-67.[4]  Where a statement offered at trial shows the

facts and circumstances relating to an interrogation that ultimately resulted in an individual

confessing to a crime, such statement is "not being offered to prove the truth of the matter

asserted.  It [is] only being offered to show what elicited petitioner's confession." *Black v.*

*Walker*, No. 97-CV-0668, 2000 WL 461106, at *7 (W.D.N.Y. Apr. 14, 2000) (denying habeas

---

[4] The record establishes that the overall interrogation of McLee lasted approximately
twelve hours, including "lengthy" breaks. *See* Pretrial Hearing (6/19/03) at p. 48 (Officer
DeJoseph stating that after McLee acknowledged that he knew Sanchez, there was "another
lengthy break" in the interrogation of McLee); *see also* Trial Tr. at pp. 1882-83.

claim alleging Confrontation Clause violation based upon alleged improper introduction of hearsay evidence), *appeal dismissed sub nom.*, *Black v. Kelly*, No. 00-2278 (2d Cir. Dec. 14, 2000).   Since the disputed testimony regarding Ismail's statements relating to McLee's alibi was not admitted for its truth, its admission was wholly consistent with *Crawford.  See id.*, 541 U.S. at 59 n.9.  Thus, McLee has failed to establish that his Sixth Amendment right of confrontation was violated, in any way, by the admission of the disputed testimony.

Moreover, even if that testimony was hearsay evidence that was improperly admitted at trial in violation of McLee's right of confrontation, that fact would not, standing alone, require reversal of his conviction.  Rather, a trial court's ruling that results in the violation of an individual's rights under the Confrontation Clause is subject to harmless error analysis.  *Perkins v. Herbert*, 596 F.3d 161, 174 (2d Cir. 2010); *United States v. McClain*, 377 F.3d 219, 222 (2d Cir. 2004) ("It is well established that violations of the Confrontation Clause, if preserved for appellate review, are subject to harmless error review ... and *Crawford* does not suggest otherwise"); *see also McBee v. Burge*, 644 F.Supp.2d 270, 283-84 (E.D.N.Y. 2009); *Bodenburg v. Conway*, No. 05 Civ. 01119, 2007 WL 2295812, at *11 (E.D.N.Y. Aug. 4, 2007) (citations omitted); *United States v. Hundley*, No. 02 Cr. 441, 2004 WL 2414038, at *8 (S.D.N.Y. Oct. 28, 2004) ("[a]dmission of evidence in violation of the Confrontation Clause is not a structural error automatically requiring a new trial but rather is subject to harmless error review").

Historically, when evaluating habeas challenges alleging error on the part of a trial court, habeas courts have inquired into whether the trial court's error had a " 'substantial and injurious effect or influence' " in determining the verdict in the criminal case.  *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993) (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)) (other

citation omitted).

Following the AEDPA, however, it became an "open question" in federal courts whether the test to be utilized in conjunction with federal habeas review of state court error remained the one set forth in *Brecht*, or instead focus upon a consideration of whether the state court's decision was contrary to, or involved an unreasonable application of, *Chapman v. California*, 386 U.S. 18 (1967).[5]  *See Benn v. Greiner*, 402 F.3d 100, 105 (2d Cir. 2005) (citation omitted); *Harvall v. Phillips*, No. 03-CV-2968, 2005 WL 2095725, at *8 (E.D.N.Y. Aug. 30, 2005).

In *Gutierrez v. McGinnis*, 389 F.3d 300 (2d Cir. 2004), the Second Circuit determined that where a state court explicitly conducts harmless error review of a claimed constitutional error, a federal habeas court must evaluate whether the state court's decision reflected an unreasonable application of *Chapman*.  *See Gutierrez*, 389 F.3d at 306; *see also Zappulla v. New York*, 391 F.3d 462, 467 (2d Cir. 2004).  In the criminal matter below, however, no harmless error review was conducted by the *McLee* court because the Appellate Division found that the trial court did not err in admitting the disputed testimony.  *McLee*, 32 A.D.3d at 1316.

Subsequent to *Gutierrez*, the Supreme Court decided *Fry v. Plier*, 551 U.S. 112 (2007). In *Fry*, the Supreme Court opined that a constitutional error in a criminal trial is harmless as long as it did not have a "substantial and injurious effect" on the jury's verdict.  *Fry*, 551 U.S. at 121-22 (citing *Brecht*); *see also Martinez v. Miller*, No. 04-CV-0090, 2009 WL 1272069, at *25 (N.D.N.Y. May 5, 2009) (Suddaby, J., adopting Report-Recommendation of Peebles, M.J.); *Toland v. Walsh*, No. 04-CV-0773, 2008 WL 65583, at *19 (N.D.N.Y. Jan. 4, 2008) (Sharpe, J.),

---

[5] In *Chapman*, the Supreme Court held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.*, 386 U.S. at 24.

13

*appeal dismissed*, *Toland v. Walsh*, No. 09-1462pr (2d Cir. Aug. 6, 2008).   In assessing whether the purportedly erroneous admission of such evidence had a substantial and injurious effect or influence in determining the jury's guilty verdict, courts should principally consider the importance of the witness's wrongly admitted testimony and the overall strength of the prosecution's case, with this latter consideration being "probably the single most critical factor" for the habeas court to consider in ruling upon the merits of his habeas claim.  *United States v. Lombardozzi*, 491 F.3d 61, 76 (2d Cir. 2007); *see also Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000).

        In the criminal matter below, although the claimed hearsay evidence upon which McLee's habeas application is based clearly cast doubt on his initial claim that he was at home at the time of the shootings, such evidence was far from critical in obtaining the convictions.  To the contrary, the record firmly establishes that the prosecutor offered compelling evidence of McLee's guilt of the crimes of which he was found guilty independent of any evidence relating to Ishmail's statements that cast doubt on McLee's alibi and the law enforcement officials' trial testimony relating to same.  Specifically, the record reflects that Earnest Shaw testified that he observed McLee exit a black automobile at the apartment complex on April 30, 2003 and begin "walking towards the building."  Trial Tr. at pp. 1682-87.  Shaw then observed McLee extend his right arm towards a group of people and begin firing a gun at the crowd.  *Id.* at pp. 1687-91.  Rita Nelson testified that while she was crouching down in her apartment for her safety, she overheard a group of men talking, and specifically recalled one of the individuals in the apartment say "you did enough, Robo."  *Id.* at pp. 948-49.[6]  Michael Wallace testified that soon after the shootings,

--------

[6] It was established at trial that McLee's nickname was "Robo."  Trial Tr. at p. 1686.

he was with McLee in a black car, which then fled the scene with "tires screeching." *Id.* at pp. 1494-95. Wallace then observed McLee "playing with something," and Wallace detected the smell of smoke inside the vehicle. Trial Tr. at pp. 1495-1500. Such testimony, which was clearly strong evidence of McLee's guilt of the crimes, must also be viewed in conjunction with petitioner's own incriminating statements to law enforcement officials – statements which plainly contradicted his initial alibi that he was at home at the time of the shooting. In those statements – which were properly heard by the jury that convicted McLee – he *inter alia*, expressed remorse over the fact that Rodriguez had died "as a result of [McLee] going after" Sanchez, whom petitioner admitted had been the actual "target" of the shooting because Sanchez had "broke[n] the rules" in an ongoing conflict involving himself and McLee. *Id.* at pp. 1864-66.

The foregoing conclusively demonstrates that the admission of Sabrina Ishmail's statements – through the testimony of Officers MacBlane and DeJoseph – did not have either a substantial or injurious effect or influence in determining the jury's guilty verdict.[7] Since the Fourth Department's decision denying this appellate claim was entirely consistent with relevant, clearly established Supreme Court precedent, McLee is not entitled to the relief he seeks herein due to the claimed violation of his Confrontation Clause rights under the Sixth Amendment. The Court therefore denies and dismisses McLee's habeas petition.

## III.   CERTIFICATE OF APPEALABILITY

Finally, the Court notes that 28 U.S.C. § 2253(c) provides, in relevant part that:

> Unless a circuit justice or judge issues a certificate of appealability,
> an appeal may not be taken to the court of appeals from –

---

[7] The Court also finds that the admission of such testimony was harmless beyond a reasonable doubt. *E.g.*, *Chapman*, 386 U.S. at 24.

> (A) the final order in a habeas corpus proceeding in
> which the detention complained of arises out of
> process issued by a State court ....[8]

28 U.S.C. § 2253(c)(1)(A).  A Certificate of Appealability may only be issued "if the applicant

has made a substantial showing of the denial of a constitutional right."  *See* 28 U.S.C. §

2253(c)(2).  Since petitioner has failed to make such a showing herein, the Court declines to

issue any Certificate of Appealability in this matter.

     **WHEREFORE**, after having reviewed the state court record, the documents submitted

by the parties in conjunction with this action, the applicable law, and for the reasons discussed

herein, it is hereby

     **ORDERED**, that McLee's petition (Dkt. No. 1) is **DENIED** and **DISMISSED**, and it is

further

     **ORDERED**, that the Clerk of Court serve a copy of this Memorandum-Decision and

Order upon the parties to this action, and it is further

---

[8] Rule 22 of the Federal Rules of Appellate Procedure also provides that an appeal may
not proceed "unless a circuit justice or a circuit or district judge issues a certificate of
appealability under 28 U.S.C. § 2253(c)."  *See* Fed.R.App.P. 22(b).

        **ORDERED**, that any state court records that were not filed in this action be returned
directly to the Attorney General at the conclusion of these proceedings (including any appeal of
this Memorandum-Decision and Order filed by any party).

        A Certificate of Appealability shall not be issued by this Court.

**IT IS SO ORDERED.**

June 11, 2010



Thomas J. McAvoy
Senior, U.S. District Judge

17